Otmar Real Estate Corporation v. Commissioner.Otmar Real Estate Corp. v. CommissionerDocket No. 3803-62.United States Tax CourtT.C. Memo 1965-189; 1965 Tax Ct. Memo LEXIS 140; 24 T.C.M. (CCH) 987; T.C.M. (RIA) 65189; July 13, 1965William F. O'Connor and Arthur Pelikow for the petitioner. Charles M. Greenspan for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ended October 31, 1959, in the amount of $17,218.85. Of*142 this amount, $100 was the result of a bookkeeping error and has been conceded by petitioner. The sole issue for decision is whether petitioner is subject to the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954. 1Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Otmar Real Estate Corporation (hereinafter sometimes referred to as petitioner) is a corporation organized under the laws of the state of New York on June 22, 1950. Since its organization, petitioner has been in the investment business; its holdings consisting primarily of securities and real estate. It filed its Federal income tax return for the fiscal year ended October 31, 1959 (hereinafter sometimes referred to as the taxable year), with the district director of internal revenue for the upper Manhattan district of New York. During all of the relevant years, Otto Marx (hereinafter sometimes referred to as Otto) was the president of petitioner and a holder of a majority of its voting stock. He was married*143 to Agnes Mosler Marx (hereinafter sometimes referred to as Agnes). They had two sons, Henry Marx and Otto Marx, Jr., and one daughter, Audrey Marx Skirball. In 1900, Otto was primarily in the municipal bond business, but thereafter he broadened his investment activity and acquired a substantial fortune by purchasing and holding various securities. During the taxable year, Otto was 89 years old and served on the board of two large, publicly-held corporations; Associated Dry Goods Corporation and General Dynamics Corporation. Otto was quite conservative in his real estate dealings and had some difficulty in making decisions. Petitioner's capital upon incorporation was contributed by Agnes and consisted of corporate stock with a cost basis of $321,089.40 and a fair market value of $643,036.50 at the time of transfer to petitioner commercial building on a lot 65feet X 100feet located at Nos. 212, 214, and 216 - 20th Street, North, Birmingham, Alabama (hereinafter sometimes referred to as the Birmingham property). The Birmingham property was acquired prior to 1913 by Otto and had been subsequently transferred by him to Agnes. In exchange for these assets, Agnes received 9,900 shares*144 of class "A" nonvoting common stock and 100 shares of class "B" voting common stock. As of October 2, 1950, the class "B" voting stock had been transferred by Agnes and was then held continuously through the taxable year as followsOtto Marx 51 sharesHenry M. Marx 24 1/2 sharesOtto Marx, Jr. 24 1/2 shares Various transfers of the class "A" nonvoting stock were made by Agnes to the other members of the family, but from January 30, 1958, through the taxable year shares were held as follows: Henry M. Marx and Otto Marx,Jr., as trustees for Agnes M.Marx4,925 1/2 sharesAudrey M. Skirball1,674 1/2 sharesHenry M. Marx1,650 sharesOtto Marx, Jr.1,650 sharesDuring the taxable year petitioner's officers were: Otto Marx, president and treasurer, Henry M. Marx, vice president, Otto Marx, Jr., vice president, Arthur W. Paegelow, secretary Petitioner had a large and active securities portfolio. At the beginning of the taxable year, petitioner's securities had an aggregate market value of $1,829,512. At the close of the taxable year, petitioner's securities had an aggregate market value of $2,026,200. Petitioner maintained an account with Ladenburg, *145 Thalmann & Co., a securities firm in New York City of which, during the taxable year, Otto Marx, Jr., was a partner. Through the taxable year dividends had been paid by petitioner as followsFiscal Year DividendsEnded In Cash In Stock 10-31-50 0 010-31-51 $ 2,500.02 010-31-52 6,500.02 010-31-53 6,500.02 010-31-54 6,500.02 010-31-55 6,500.02 010-31-56 99.37 $6,525.63 200 shares of Federated Dept. Stores10-31-57 59.26 5,875.65 200 shares of Federated Dept. Stores10-31-58 56.62 9,380.88 500 shares of International Mining Corp.10-31-59 10,000.00 0 For the fiscal years ended October 31, 1955, through the taxable year, dividends paid by petitioner as a percentage of income after taxes were as follows: DividendsApproximatePaid% ofFiscalTaxableIncomein Corp.DividendYearIncomeIncomeafteror OtherafterEndedReportedTaxesTaxesPropertyTaxes10-31-55$ 95,286.31$23,242.12$ 72,044.19$ 6,500.029.010-31-56102,816.6823,477.6879,339.006,625.008.410-31-57105,531.3123,650.8681,880.455,934.917.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,392.4419,412.7872,979.669,437.5012.910-31-59239,145.7255,567.46183,578.2610,000.005.4*146 On December 12, 1951, petitioner established a reserve account on its books for the rehabilitation of the Birmingham property. During the years 1951 through 1955, petitioner annually set aside $50,000, for a total of $250,000. This amount was charged to earned surplus and has never been expended, but has been carried by petitioner on its balance sheet as a "Reserve for Rebuilding." In addition to the Birmingham property originally contributed by Agnes, petitioner has made the following acquisitions: 1. On July 13, 1955, an unimproved lot in Birmingham for $14,231.78. 2. On July 8, 1958, a building at 240 Broadway in New York City for $125,168.45 which it sold for $250,000 on June 1, 1959. 3. On July 22, 1960, property at 132 East 23rd Street in New York City for $270,665.45. 4. On March 15, 1962, a lease on property at 200-202 East 72nd Street in New York City for $100,000. Petitioner has made the following interest-free loans to Otto and Agnes: LOANSREPAYMENTSOTTO10-31-57$11,309.764-23-58$ 13.9612-17-57308.817- 2-5811,604.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,000.004- 3-6189,000.003-20-627,763.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.993-23-622.008-31-637,731.01AGNES4-15-58$37,941.798- 7-58$33,500.0010-20-584,441.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,100.9910-30-5959,100.993- 9-6054,084.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.533-16-60225.008- 8-607,500.0010-13-6046,794.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,869.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.078- 1-615,000.0010- 6-6136,853.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,002.3910-31-6327,002.39*147 The Birmingham Corporation was another corporation organized by Otto in 1928. At the time of its organization, it was classified as a personal holding company due to the fact that most of its assets were securities, but by 1956 it had acquired enough real estate to change its status. Petitioner in its Federal income tax return for the fiscal year ended October 31, 1959, reported the following (cents omitted): Dividends from securities$ 55,584Interest 2287Gross rentals from real estate63,645Long-Term capital gainFrom the sale of various securi-ties26,492From the sale of real estate at240 Broadway, New York City121,181Total income$267,192Total deductions, includingcost of operating and main-taining real estate28,046Taxable income$239,145Dividends credit43,931$195,214Reported Tax Liability$ 55,567 3Petitioner's balance sheet at the close of its fiscal years 1958 and 1959 disclosed the following: October 31, 1958October 31, 1959Cash$ 53,231.07$ 63,544.14Receivables09,000.00Investments -771,718.45951,316.88Securities 4Real Estate - Net BookValue 5$438,714.28$314,231.78Less Depreciation17,041.6718,416.67421,672.61295,815.11Mortgage0150,000.00$1,246,682.13$1,469,676.13LiabilitiesNONENONECapital Stock$ 10,000.00$ 10,000.00Paid in Surplus611,089.40611,089.40Reserve for Rebuilding250,000.00250,000.00Earned Surplus375,592.73598,586.73$1,246,682.13$1,469,676.13*148 For 1958 and 1959 the income reported for Federal income tax purposes by petitioner's shareholders who were members of the Marx family reached the following tax brackets: 19581959Otto and Agnes M. Marx62%59%Henry M. Marx78%75%Otto Marx, Jr.72%53%Audrey M. SkirballNot AvailableIn accordance with section 534(b), respondent sent petitioner a notice of intention to issue a deficiency notice for petitioner's 1959 fiscal year based on section 531. Pursuant to 534(c) petitioner sent respondent a statement setting forth the grounds on which petitioner relied to establish that the earnings and profits had not been permitted to accumulate beyond the reasonable needs of the business. The*149 grounds relied upon by petitioner in its statement were as follows: A. During the fiscal year the taxpayer had in existence a definite plan for the acquisition of new buildings and the expansion of its already existing real estate business. Pursuant to this plan, many realty properties were considered for acquisition during the fiscal year resulting in a purchase of property costing $270,664.45 which was acquired in August, 1960. B. The taxpayer was also required by virtue of certain liabilities to retain all of its earnings during the fiscal year. These liabilities are enumerated as follows: 1. Extensive renovation and modernization of its Birmingham, Alabama, property, the cost of which has been reliably estimated to be about $250,000. 2. Liability for its operating expenses for one year, which expenses could be approximated to equal $30,000 for the fiscal year ended October 31, 1959. C. Taxpayer's prior history of dividend payments and dividend payments subsequent to the fiscal year in question. Opinion Section 532 provides that the accumulated earnings tax imposed by section*150 531 shall apply to corporations formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that if earnings and profits are permitted to accumulate beyond the reasonable needs of the business, the proscribed purpose will be presumed unless the corporation by the preponderance of evidence proves to the contrary. Section 534(a) puts the burden of proving that earnings and profits have accumulated beyond the reasonable needs of a corporation on the respondent in a proceeding before the Court if: 1. Notification of the proposed accumulated earnings tax had not been sent to petitioner prior to the deficiency letter, or 2. After receiving notification, petitioner submits a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. In the instant*151 case, respondent did send the proper notification to petitioner, pursuant to section 534(a) and, in turn, petitioner did submit a timely statement purporting to set forth grounds and supporting facts on which it would rely to establish that accumulation of earnings and profits for its fiscal year 1959 were not beyond reasonable needs of its business. Respondent contends that the petitioner's statement does not comply with the requirements of section 534(c) in that it fails to set forth "grounds" as that term is used in section 534(c) and further that the "grounds" designated are not supported by sufficient facts. Our decision here does not depend upon which party has the burden of proof, for not only did petitioner fail to justify its accumulations, but respondent has quite convincingly shown that the earnings and profits were accumulated beyond the reasonable needs of petitioner's business. In determining whether any amount of earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years must be taken*152 into account. Income Tax Regs., section 1.535-3(b)(ii). If the reasonable needs of the business can be satisfied from earnings and profits accumulated in prior years, there is no necessity for retaining any portion of current earnings and profits to satisfy such needs. Electric Regulator Corporation, 40 T.C. 757, 764 (1963), reversed on other grounds, 336 F. 2d 339 (1964). It is necessary, therefore, to determine the amount of petitioner's accumulated earnings and profits as of the beginning of the taxable year. Petitioner has offered no direct evidence as to this amount. The only evidence from which it might be inferred is petitioner's October 31, 1958, balance sheet. Accordingly, we assume that the accumulated earnings and profits as of the beginning of the taxable year was $625,592.73, which is the sum of the amount of the "Reserve for Rebuilding" and the "Earned Surplus" accounts. 6*153 Even if all the "grounds" submitted by petitioner were true, there would be no justification for accumulating any current earnings and profits since petitioner has not even justified retaining an amount equal to the $625,592.73 accumulated prior to the taxable year. We now turn to the specific grounds which petitioner has set forth in its statement to justify accumulation. 1. Petitioner contends that it had in existence during the fiscal year a definite plan for the acquisition of new buildings in connection with the expansion of its already existing real estate business. The evidence which petitioner presented concerning this plan was vague and not supported by substantial, material and definite facts. American Metal Products Corporation, 34 T.C. 89, 99 (1960), affd. 287 F. 2d 860 (1961). There was no indication of the type, price range or number of properties the petitioner would consider buying. Nor can petitioner point to a general plan of expanding its real estate holdings, other than to escape the tax imposed upon personal holding corporations. The value of petitioner's real estate was relatively small in comparison with the value of its securities. *154 Moreover, it is difficult to see how petitioner's case is improved by its admission that the controlling shareholder, Otto, who at all times had the final decision, was elderly and ultra-conservative with respect to any acquisition of real estate. Petitioner, in its statement, listed several properties that were considered by Otto but were rejected for various reasons. We note that only one of these was considered in 1959 and that was in January. Furthermore, we note that in his testimony, Otto Marx, Jr., indicated that some or all of the discussions that were had with respect to the acquisition of real estate were being conducted on behalf of principals other than petitioner. 2. Petitioner contends that it intended to renovate and modernize its Birmingham property at a cost estimated to be about $250,000. We will assume arguendo that this was a valid purpose, though we note that there has never been any such expenditure. 3. Petitioner contends that it desired to retain enough earnings and profits to pay its operating expenses for its 1960 fiscal year. Petitioner estimated these expenses to be $30,000, based on its experience in the taxable year. Again we assume for the sake*155 of argument that this is a valid purpose, although we note that $10,047.37 of its 1959 fiscal year expenses were allocable to the New York City property which petitioner sold during the year. 4. Petitioner contends finally that because of its dividend record it should be allowed to retain earnings and profits. We cannot agree with this. While we would not substitute our judgment as to the amount of petitioner's earnings which should be distributed annually, we believe that where the distributions have been small (for the most part, under 10 percent of petitioner's earnings after taxes) petitioner may not use its dividend history as a reason for retaining its earnings. Because petitioner has failed to set forth grounds and substantiating facts justifying further retention of earnings and profits, we hold that any accumulation of current earnings and profits would be beyond the reasonable needs of the business. Inasmuch as petitioner has not, pursuant to section 532, shown by a preponderance of the evidence that the corporation was not availed of for the purpose of avoiding the income tax*156 with respect to its shareholders, petitioner is liable for the section 531 tax. Finally, petitioner asks that it be given a credit under section 535(c). Section 535(c) allows a credit equal to the earnings and profits for the taxable year that are retained for the reasonable needs of the business. This amount, along with a deduction for dividends paid during the year, is subtracted from the taxable income (after certain adjustments have been made under section 535(b)(1)) in order to arrive at the figure to which the section 531 tax is applied. As set forth above, however, we are of the opinion that no amount of earnings and profits for the taxable year may be retained for the reasonable needs of the business. Thus, the amount of the section 535(c) credit is zero. Section 535(c)(2) provides a minimum credit and states in no case shall the accumulated earnings credit be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding*157 year. This minimum credit also would be zero since the accumulated earnings and profits at the close of the preceding taxable year was in excess of $100,000. Decision will be entered for the respondent. Footnotes1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩2. Not including $14,043.33 on interest on taxexempt securities (which were not owned as of June 22, 1950). ↩3. Should have been reported as $55,667, due to bookkeeping error.↩4. Shown at cost. Said securities had a market value of $1,829,512 as of October 31, 1958, and a market value of $2,026,200 as of October 31, 1959. ↩5. Shown at claimed market value. As of October 31, 1958, this item consisted of the Birmingham and 240 Broadway properties. The 20th Street property was carried on the books at a claimed market value of $300,000, its costs basis not being known but a basis for depreciation of "75/100,000" being claimed.↩6. We note that "earnings and profits" as defined for tax purposes is very often not identical to "earned surplus" as defined by state law, but there is no evidence to show wherein they differed. Further, there are situations where the amount of accumulated earnings and profits is not necessarily the crucial factor. If the amount of liquid assets of a corporation is not in excess of immediate or reasonably foreseeable business needs, a corporation could escape the accumulated earnings tax even though its total earnings and profits were in excess of its reasonable business needs. Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495↩ (1960), affirming a Memorandum Opinion of this Court.